Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/13/2023 09:08 AM CDT

Paw Kee, appellee, v. Christian
L. Gilbert, appellant.
___ N.W.2d ___

Filed June 6, 2023.    No. A-22-317.

1. **Child Custody: Jurisdiction: Appeal and Error.** The question whether jurisdiction should be exercised under the Uniform Child Custody Jurisdiction and Enforcement Act is entrusted to the discretion of the trial court and is reviewed by an appellate court de novo on the record for abuse of discretion.

2. ____: ____: ____. In considering whether jurisdiction exists under the Uniform Child Custody Jurisdiction and Enforcement Act, a jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires an appellate court to reach a conclusion independent from the trial court.

3. **Paternity: Appeal and Error.** In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion.

4. **Child Support: Appeal and Error.** An appellate court reviews child support determinations de novo on the record, but the trial court's decision will be affirmed absent an abuse of discretion.

5. **Paternity: Attorney Fees: Appeal and Error.** An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed.

6. **Child Custody: Jurisdiction: Courts: Records.** Neb. Rev. Stat. § 43-1235 (Reissue 2016) does not require a verbatim transcription of the consultation between two courts after a hearing; rather, a sufficient record of the courts' posthearing consultation is made when the courts enter orders memorializing the substance of their communication.

7. **Child Custody.** When deciding custody issues, the court's paramount concern is the child's best interests.

8. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other.

9. **Child Support: Appeal and Error.** Whether a child support order should be retroactive is entrusted to the discretion of the trial court, and an appellate court will affirm its decision absent an abuse of discretion.

10. **Child Support: Taxation: Presumptions.** In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child.

11. **Child Support: Taxation: Waiver.** A court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires.

Appeal from the District Court for Lancaster County: Ryan S. Post, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Courtney R. Ruwe and Adam E. Astley, of Astley Putnam, P.C., L.L.O., for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Christian L. Gilbert appeals the decision of the Lancaster County District Court in a paternity action brought by Paw Kee (Paw). The district court determined that Christian was the father of Cylise Gilbert, awarded sole legal and physical custody of Cylise to Paw subject to Christian's specified parenting time, and ordered Christian to pay child support and attorney fees. On appeal, Christian challenges the district court's jurisdiction, its award of custody and parenting time, and its award of child support and attorney fees. We affirm.

## II. BACKGROUND

Paw and Christian, who never married, are the parents of Cylise, born in 2016 in Iowa. Paw was originally from Burma; she and Christian met through a job-training program in Chadron, Nebraska. After Paw graduated from the program, she moved to Iowa to live with Christian.

On January 9, 2020, Paw filed a complaint for paternity, custody, and child support in the district court for Lancaster County. In her complaint, Paw stated that she and Cylise had been residents of Nebraska since she "fled her home in Iowa where she resided with [Christian] to escape immediate risk of harm due to [his] mistreatment and abuse." She claimed that Nebraska had jurisdiction over this matter pursuant to Nebraska's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), Neb. Rev. Stat. §§ 43-1226 to 43-1266 (Reissue 2016 & Cum. Supp. 2022); she specifically pointed to § 43-1238(a). Paw sought a paternity order establishing Christian as Cylise's father; awarding her sole legal and physical custody, subject to Christian's parenting time; determining child support and requiring Christian to pay a percentage of any childcare expenses and medical, dental, and vision costs not paid by insurance in accordance with the Nebraska Child Support Guidelines; awarding her the "deductions/exemptions/child care tax credit" for Cylise "each and every year"; and awarding her attorney fees and costs. Paw also sought a temporary restraining order to protect her and Cylise from harassment and harm, noting that Christian had a third degree domestic assault case pending in the district court wherein she was the victim. On January 13, Paw filed an ex parte motion for temporary custody, which was granted that same day.

On January 23, 2020, Christian filed a motion to dismiss for lack of jurisdiction under the UCCJEA. He claimed that he filed a petition to establish paternity, custody, and child support in an Iowa district court on December 17, 2019. He alleged that Iowa was Cylise's home state as defined

under the UCCJEA and that Iowa had not declined to exercise jurisdiction.

A jurisdiction hearing and hearing on Christian's motion to dismiss was held in the Lancaster County District Court on February 10, 2020, with Judge Richard Clogg from the Iowa district court appearing telephonically. Details regarding the hearing will be set forth as necessary in our analysis. Following the hearing and a consultation between the judges, the Lancaster County District Court entered an order on February 14, stating the Iowa district court declined jurisdiction and, therefore, the Lancaster County District Court had jurisdiction over the matter; the court overruled and denied Christian's motion to dismiss. That same day, a copy of the Iowa court's order was filed with the clerk of the Lancaster County District Court wherein the Iowa court declined jurisdiction, noting that "a court with jurisdiction may decline to act if another state is a more appropriate forum." Christian's Iowa case was dismissed.

On May 8, 2020, the Lancaster County District Court entered a temporary order based "on the agreement of the parties" granting Paw physical custody of Cylise, subject to Christian's parenting time. Christian was to have parenting time every other weekend from Friday at 5 p.m. until Monday before noon; all pickups and drop-offs were to occur at Cylise's daycare in Lincoln, Nebraska, and Christian was responsible for all transportation. Christian was also to have video visitation with Cylise every Tuesday and Thursday evening, as well as on Sunday evening on the weekends that he did not have in-person parenting time. The temporary order was signed by the court, and "[a]pproved as to form and content" by both parties and their attorneys.

On December 11, 2020, Christian, now represented by new counsel, filed a "Motion to Reconsider and Vacate, Motion to Modify, and Objection to and Motion to Strike 'Notice of Trial.'" Christian essentially claimed that the district court should vacate its previous orders because Nebraska lacked

jurisdiction. Alternatively, Christian suggested that "[a]ssuming *solely* for the sake of argument that [Nebraska] had and has jurisdiction under the UCCJEA to make a child custody determination," then had the court known of events that occurred since the temporary order was entered, the court would have and now should award him temporary legal and physical custody. Following a December 18 hearing on Christian's motion, the court entered an order on March 15, 2021, overruling all requested relief except Christian's request "to Strike 'Notice of Trial.'"

Having been given leave to file his answer out of time, Christian filed his answer and counterclaim on April 16, 2021, wherein he admitted that he was Cylise's father. In his counterclaim, Christian requested that the district court decree him to be Cylise's father, award him sole legal and physical custody of Cylise, adopt a parenting plan that served Cylise's best interests, order Paw to pay child support in accordance with the Nebraska Child Support Guidelines and an equitable portion of childcare expenses and necessary health care expenses not covered by health insurance, and award him attorney fees and costs. Christian also raised the affirmative defense of lack of jurisdiction to Paw's complaint.

Five days of trial took place over the course of several months: July 22 and 23, August 31, and October 7, 2021, and February 8, 2022. The parties stipulated that paternity was not an issue and that Christian was Cylise's father. The district court accepted the stipulation. Paw (via an interpreter), Christian, and several other witnesses testified, and numerous exhibits were received into evidence. The evidence relevant to the issues on appeal will be discussed as necessary in our analysis.

On January 4, 2022, Christian filed an application for an order to show cause, claiming that Paw was in contempt for depriving him of 5½ hours of parenting time on December 24, 2021, and for not communicating directly with him that day. A hearing on the order to show cause was held on

February 18, 2022. In its order entered on March 31, the district court found that Paw's violation of the temporary order regarding parenting time was not willful and that Christian failed to meet his burden of proof by clear and convincing evidence. The court also found that the temporary order recommended, but did not require, the parties to communicate directly and therefore, there was no violation of the temporary order in that regard.

The district court entered its decree on March 31, 2022, finding that Christian was Cylise's father. The court found that Christian committed domestic intimate partner abuse and awarded Paw sole legal and physical custody of Cylise, subject to Christian's specified parenting time. Christian was to have regular parenting time every other weekend from Friday at 5 p.m. to Sunday at 8 p.m., and summer parenting time was to follow the regular parenting time schedule; a holiday parenting time schedule was also established. Christian was responsible for all transportation, and the parent not exercising parenting time was allowed up to 10 minutes of daily telephone contact with Cylise. Christian was ordered to pay $535 per month in child support commencing on April 1, 2022, and retroactive from February 1, 2020. Paw was awarded the dependency and tax exemption benefits for Cylise each year. Christian was ordered to pay 64 percent of all nonreimbursed reasonable and necessary health care expenses for Cylise after the threshold amount of $250 per calendar year was met. Christian was also ordered to pay 64 percent of all childcare expenses incurred as a result of education or work, as well as 64 percent of Cylise's activity and education expenses. The parties were to utilize "AppClose" to discuss Cylise unless an emergency arose. Finally, Christian was ordered to pay $30,000 of Paw's attorney fees and costs.

On April 1, 2022, Christian filed a motion for new trial, a motion to vacate, and a motion to alter or amend judgment. Following a hearing on those motions, the district court entered an amended decree on April 21, wherein the court

stated that "[t]he retroactive commencement of child support establishes an arrearage in the amount of $13,375.00," "and commencing April 1, 2022, [Christian] shall pay such judgment in the amount of $300.00 per month until paid in full." The district court overruled Christian's motions for new trial and to vacate. The motion to alter or amend was "sustained, in part, and overruled, in part, as reflected in this Amended Decree."

Christian appeals.

## III. ASSIGNMENTS OF ERROR

Christian assigns eight errors, which we consolidate as follows: The district court erred in (1) exercising its child custody jurisdiction and not making a record of its communication with Judge Clogg, (2) awarding exclusive legal and physical custody of Cylise to Paw and adopting and ordering its parenting plan, (3) refusing exhibit 36, (4) using its retroactive and prospective child support determinations and awarding Paw the exclusive entitlement to the income tax exemption for Cylise, and (5) ordering Christian to pay attorney fees and requiring them to be paid to Paw's attorney.

## IV. STANDARD OF REVIEW

[1] The question whether jurisdiction should be exercised under the UCCJEA is entrusted to the discretion of the trial court and is reviewed by an appellate court de novo on the record for abuse of discretion. *Hogan v. Hogan*, 308 Neb. 397, 954 N.W.2d 868 (2021).

[2] In considering whether jurisdiction exists under the UCCJEA, a jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires an appellate court to reach a conclusion independent from the trial court. *Hogan, supra*.

[3] In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of

discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022).

[4] An appellate court reviews child support determinations de novo on the record, but the trial court's decision will be affirmed absent an abuse of discretion. See *State on behalf of Martinez v. Martinez-Ibarra*, 281 Neb. 547, 797 N.W.2d 222 (2011).

[5] An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Absent such an abuse, the award will be affirmed. *Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999).

## V. ANALYSIS

### 1. Jurisdiction

Christian assigns that the district court erred in exercising its child custody jurisdiction because Iowa was Cylise's home state and Iowa did not properly decline to exercise its child custody jurisdiction. Christian further claims that the district court erred by not making a record of its communication with Judge Clogg from Iowa.

### (a) UCCJEA

Section 43-1238 of Nebraska's UCCJEA states in relevant part:

(a) Except as otherwise provided in section 43-1241 [temporary emergency jurisdiction], a court of this state has jurisdiction to make an initial child custody determination only if:

(1) this state is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under subdivision (a)(1) of this section, or *a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum* under section 43-1244 [inconvenient forum] or 43-1245 [reason of conduct], and:

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under subdivision (a)(1) or (a)(2) of this section have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 43-1244 or 43-1245[.]

. . . .

(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.

(Emphasis supplied.) See, also, § 43-1243 (simultaneous proceedings).

Section 43-1235 states:

(a) A court of this state may communicate with a court in another state concerning a proceeding arising under the [UCCJEA].

(b) The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, they shall be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made.

(c) Communication between courts on schedules, calendars, court records, and similar matters may occur

without informing the parties. A record need not be made of the communication.

(d) Except as otherwise provided in subsection (c) of this section, a record shall be made of a communication under this section. The parties shall be informed promptly of the communication and granted access to the record.

(e) For the purposes of this section, record means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

We note that Iowa's version of the UCCJEA can be found in Iowa Code Ann. § 598B (West 2020).

### (b) Hearing and Orders

A hearing on Christian's motion to dismiss for lack of jurisdiction was held in the Lancaster County District Court on February 10, 2020, with Judge Clogg from the Iowa district court appearing telephonically. Paw was present with her Nebraska counsel. Christian was present with his Nebraska counsel, and his Iowa counsel appeared telephonically. When Judge Clogg noted that Paw did not have counsel in Iowa, her Nebraska counsel stated that she was also licensed in Iowa and that she would enter "essentially a limited appearance in the Iowa case" at that point because Paw "didn't want to retain counsel in Iowa until there was a determination as to jurisdiction."

Paw's counsel made argument as to why the case should be heard in Nebraska, including, but not limited to, the fact that Paw is the only legal parent of the child; Paw came to Nebraska in September 2019 because of an abusive relationship with Christian; Christian had a pending Nebraska case for domestic assault of Paw; Christian had the financial resources to defend his case, whereas Paw had limited funds; and the child had daycare and family in Nebraska and had Medicaid in Nebraska.

Christian's counsel argued that Iowa was the child's home state and that the case should be heard in Iowa. Counsel stated that Christian had signed a paternity acknowledgment in Iowa, the child was born in Iowa and lived with both parties in Iowa until October 2019, Christian assisted Paw with her move to Nebraska in October, and the domestic violence issue occurred shortly thereafter in Nebraska and Christian was currently on diversion. Counsel stated that 2 weeks after Paw moved to Nebraska, she texted Christian to come get Cylise because she did not want him anymore, so Christian came and got him. Cylise lived in Iowa from mid-October 2019 to January 14, 2020, which is the date that law enforcement in Iowa took the child from preschool. Counsel further stated that Christian filed a petition to establish paternity, custody, and support in Iowa on December 17, 2019, and while Paw received constructive notice, she was not formally served. Paw's counsel responded that Paw never had constructive notice; that the child did not live in Iowa after mid-October 2019, but, rather, the child went back and forth between the parents; that Christian refused on several occasions to let Paw know where the child was; and that Christian repeatedly told Paw that she had no rights because she is from a different country.

After hearing arguments from both parties, the Lancaster County District Court noted the UCCJEA envisioned that the judges from both states consult and make a determination on jurisdiction, and he asked whether Judge Clogg was available to stay on the phone for consultation, to which Judge Clogg replied, "Yes." Counsel for the parties were asked whether they had any objection to that procedure, and counsel for both parties stated, "No, Your Honor." The Lancaster County District Court adjourned the hearing but said it would stay on the phone with Judge Clogg and then let counsel know as soon as a decision was made.

On February 14, 2020, the Lancaster County District Court filed an order stating that a hearing was held on

Christian's motion to dismiss and the telephonic hearing was had with Judge Clogg of the Jasper County, Iowa, District Court. The order stated, "The Jasper County, Iowa District Court has declined jurisdiction . . . finding that Jasper County, Iowa is an inconvenient forum"; "[a] copy of the order from the Jasper County, Iowa District Court will be filed with the Clerk of the District Court in this case." Therefore, the Lancaster County District Court concluded that it had jurisdiction over the matter and overruled and denied Christian's motion to dismiss. That same day, a copy of the Iowa court's order was filed with the clerk of the Lancaster County District Court. The Iowa order recounted that a hearing was held with the parties and their counsel; that after the hearing, the courts conferred regarding jurisdiction; and that it was declining jurisdiction because another state was a more appropriate forum. Christian's Iowa case was dismissed.

A temporary order "on the agreement of the parties" was entered on May 8, 2020, awarding Paw physical custody of Cylise and Christian parenting time every other weekend.

On December 11, 2020, nearly 9 months after the jurisdiction issue was decided, Christian, now represented by new counsel, filed a motion asserting that the district court should vacate its earlier orders because Nebraska lacked jurisdiction. Christian claimed that Iowa's declination of jurisdiction (1) was void because it had not acquired personal jurisdiction over Paw in its case and (2) was not properly based on Nebraska being a more convenient forum because relevant factors were not considered and because the parties were not allowed to submit information on the relevant factors. Christian further argued that assuming for the sake of argument that Nebraska had jurisdiction, temporary custody should have been awarded to Christian.

In its order filed on March 15, 2021, the Lancaster County District Court overruled Christian's "Motion to Reconsider and Vacate, Motion to Modify." The court determined that it had subject matter jurisdiction and could exercise that

jurisdiction under the UCCJEA; that Iowa, the child's home state, declined its jurisdiction because it found that Nebraska was the more appropriate forum; and that the Iowa order was not void for lack of personal jurisdiction because "Iowa's version of the UCCJEA expressly says that personal jurisdiction over a party is not necessary to make a child-custody determination" and Iowa did have personal jurisdiction because Paw's attorney entered a limited appearance for her in the Iowa case for purposes of determining which court would exercise jurisdiction. The court also found that it could not review alleged errors committed by the Iowa court regarding that court's consideration of statutory factors. Finally, the court concluded that changing temporary custody was not in Cylise's best interests.

### (c) Nebraska Has Jurisdiction

There is seemingly no dispute that Iowa was Cylise's home state. However, Nebraska had jurisdiction to make the initial child custody determination in this case because Iowa declined to exercise jurisdiction. See § 43-1238(a). Christian contends that Iowa did not "actually" decline jurisdiction because its order stated only that it "should" decline its authority. We are not persuaded by Christian's argument. The Iowa order states, in relevant part:

> Iowa Code section 598B.207 provides that a court with jurisdiction may decline to act if another state is a more appropriate forum. In taking into account the relevant factors, including those listed in the statute, the court finds that the Iowa district court should decline its authority to decide this case in keeping with section 598B.207.
>
> IT IS THEREFORE ORDERED that this case is dismissed, without prejudice, at [Christian's] costs.

As noted by Paw, the Iowa court "*dismissed* the case, which is an *act* terminating the Court's jurisdiction." Brief for appellee at 22 (emphasis in original). A reading of the Iowa

court's order shows that it declined jurisdiction because another state was a more appropriate forum.

Just like he argued to the district court in his December 2020 motion to reconsider and vacate, Christian once again argues that Iowa's declination of jurisdiction was void because it had not acquired personal jurisdiction over Paw in its case. And like the district court, we find that the Iowa order was not void for lack of personal jurisdiction, because Iowa's version of the UCCJEA expressly says that personal jurisdiction over a party is not necessary to make a child custody determination. See Iowa Code Ann. § 598B.201(3) (West 2020) ("[p]hysical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination"). See, also, § 43-1238 (nearly identical provision in Nebraska statute). Additionally, Paw's attorney entered a limited appearance for her in the Iowa case for purposes of determining which court would exercise jurisdiction. And, as noted by Paw, "[she] is the only party who has standing to assert a defect in process or service of process on her." Brief for appellee at 24 (emphasis omitted).

Finally, Christian argues that the Lancaster County District Court erred in not making a record of its communication with Judge Clogg because no bill of exceptions was made of their telephonic communication. Section 43-1235(b) provides that the court of this state may allow the parties to participate in the communication with the court in another state concerning proceedings arising under the UCCJEA, but if the parties are not able to participate in the communication, they must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made. Section 43-1235(b) was satisfied in this case when a hearing was held in the Lancaster County District Court on February 10, 2020, with Judge Clogg from the Iowa district court appearing telephonically, where both parties were present with counsel representing them in both states, and where the parties were given the opportunity to present facts and legal arguments regarding

jurisdiction; a bill of exceptions was made of the foregoing hearing.

Christian claims that a bill of exceptions was also required to be made of the private telephonic consultation between the Lancaster County District Court judge and Judge Clogg that took place after the hearing. However, Christian points to no authority requiring a verbatim transcription of the judges' posthearing consultation. We note that § 43-1235 provides that with the exception of communication between courts on schedules, calendars, court records, and similar matters, a "record shall be made" of a communication between the courts concerning a proceeding arising under the UCCJEA, and "[t]he parties shall be informed promptly of the communication and granted access to the record." § 43-1235(d). And as set forth previously, a "record means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." § 43-1235(e). Section 43-1235 mirrors Unif. Child Custody Jurisdiction and Enforcement Act (1997) § 110, 9 (part IA) U.L.A. 497 (2019). The comment to § 110 states in relevant part:

> This section does require that a record be made of the conversation and that the parties have access to that record in order to be informed of the content of the conversation. The only exception to this requirement is when the communication involves relatively inconsequential matters such as scheduling, calendars, and court records. Included within this latter type of communication would be matters of cooperation between courts under Section 112. *A record includes notes or transcripts of a court reporter who listened to a conference call between the courts, an electronic recording of a telephone call, a memorandum or an electronic record of the communication between the courts, or a memorandum or an electronic record made by a court after the communication.*

Unif. Child Custody Jurisdiction and Enforcement Act (1997), *supra*, comment, 9 (part IA) U.L.A. at 498 (emphasis supplied). If "notes" by a court reporter, or a memorandum made by a court "after the communication," can constitute a "record," then a verbatim transcription is clearly not required. *Id*.

[6] Here, both judges entered orders recounting that a hearing was held with both courts and the motion to dismiss was argued. The bill of exceptions from the hearing noted that the judges were going to stay on the phone for consultation and that neither party objected to that procedure. The Iowa order also noted that after the telephonic hearing, both courts conferred regarding jurisdiction. The orders from both courts also stated that Iowa was declining jurisdiction, because there was a more convenient or appropriate forum. The orders of the courts memorialized the substance of their communication, and the orders therefore sufficiently constituted "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." § 43-1235(e). We find that § 43-1235 does not require a verbatim transcription of the consultation between two courts after a hearing; rather, a sufficient record of the courts' posthearing consultation is made when the courts enter orders memorializing the substance of their communication.

For the foregoing reasons, we find that Nebraska properly exercised jurisdiction in this case.

## 2. CUSTODY AND PARENTING TIME

Christian claims that the district court erred in awarding legal and physical custody of Cylise to Paw. He argues that the court's custody determinations were based on findings that were contradicted by the evidence and were a complete misapplication of the law. He further argues that the district court did not provide him enough parenting time with Cylise and should not have made him responsible for all transportation.

(a) General Principles of Law

[7] When deciding custody issues, the court's paramount concern is the child's best interests. *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). The best interests inquiry has its foundation in both statutory and case law. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Domestic intimate partner abuse means an act of abuse and a pattern or history of abuse evidenced by one or more of the following acts: physical or sexual assault, threats of physical assault or sexual assault, stalking, harassment, mental cruelty, emotional abuse, intimidation, isolation, economic abuse,

or coercion against any current or past intimate partner, or an abuser using a child to establish or maintain power and control over any current or past intimate partner, and, when they contribute to the coercion or intimidation of an intimate partner, acts of child abuse or neglect or threats of such acts, cruel mistreatment or cruel neglect of an animal, or threats of such acts, and other acts of abuse, assault, or harassment, or threats of such acts against other family or household members. See Neb. Rev. Stat. § 43-2922(8) (Cum. Supp. 2022).

When a court is required to develop a parenting plan, Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) permits limitations to parenting time or other access for a parent if the preponderance of the evidence demonstrates the parent has, among other things, "committed child abuse or neglect," committed "domestic intimate partner abuse," or "interfered persistently with the other parent's access to the child." If a parent is found to have engaged in such activity, "limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." *Id.* Further, the limitations permitted by § 43-2932 include, but are not limited to, "allocation of sole legal custody or physical custody to one parent"; "[s]upervision of the parenting time, visitation, or other access between a parent and the child"; "[e]xchange of the child between parents through an intermediary or in a protected setting"; "[r]estraints on the parent from communication with or proximity to the other parent or the child"; "[d]enial of overnight physical custodial parenting time"; and "[a]ny other constraints or conditions deemed necessary to provide for the safety of the child, a child's parent, or any person whose safety immediately affects the child's welfare." The parent found to have engaged in the behavior specified in subsection (1) of § 43-2932 has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent. § 43-2932(3).

### (b) Evidence at Trial

### *(i) Christian's Testimony*

Christian, who was 24 years old at the time of trial, testified that he met Paw at a job-training program in Chadron, Nebraska, in 2014 when he was 17 years old; she was 19 years old at the time. Paw was originally from Burma, and he helped her learn English and tutored her. Christian finished the program in February 2016 and moved back to Iowa to start working as a carpenter. Paw graduated from the program in May and moved to Iowa to live with Christian. Cylise was born later that year. Christian worked from 6 a.m. to 2:30 p.m. Monday through Friday. Paw stayed home with Cylise, but Christian "had a major role in taking care of Cylise after work" because Paw would "lock herself in the [bed]room" and "do her own thing" because she had been with Cylise all day. Christian took care of Cylise's needs from 2:30 p.m. to 6 a.m. On weekends, they either spent time with Christian's family or traveled to see Paw's family in Lincoln. Christian made all of Cylise's doctor appointments and attended all appointments with Paw because she still had a language barrier.

In November 2017, Christian was injured at work but continued working light duty. Paw started working outside of the home in the spring of 2018, when Cylise was approximately 18 months old. She worked second shift, from 2 or 3 p.m. until 10 or 11 p.m. and had "mandatory Saturdays most of the time." Christian stayed home with Cylise when Paw worked second shift. She eventually ended up switching to first shift, and they hired a family friend to babysit Cylise. Both parties worked the same shift for about 5 weeks, but starting in October, Christian's employer paid him "to stay home" while they went through the workers' compensation settlement process, so Christian was able to care for Cylise; Christian accepted a workers' compensation settlement a little over a year later, in November 2019.

Christian testified that there were physical altercations with Paw during their relationship. Christian said that Paw

slapped him across the face when he was holding Cylise, who was 2 weeks old at the time. Then, during the summer of 2017, Christian and Paw were arguing while he was driving them and she "was slapping and trying to punch me in the side of the head"; Cylise was in the car at the time. After that, there were "[m]ore than 20" times that Paw slapped him through September 2019; she used a closed fist on a "[c]ouple occasions" and kicked him "a handful of times." Christian denied ever slapping, pushing, or hitting Paw, or throwing any objects at her during that same timeframe.

Christian stated that Paw's friend August Moo (August) and her two children came to live with them in March 2019 and stayed for 5 months. Christian had an affair with August during that time.

On October 4, 2019, Christian and Paw traveled to Lincoln with Cylise so that they could help Paw's mother look at a house that was for sale. On the morning of October 5, Christian "woke up . . . to Paw . . . going through [his] phone." Christian said Paw "locked herself in the bathroom and when [he] knocked on the door, she opened the door, grabbed [him] by [his] shirt, pulled [him] into the bathroom, followed by a punch in the face" and then asked him why August was messaging him. After a discussion, Paw forgave Christian, and they were going to "work through it." However, later that day, Paw called him a liar, said he cheated on her and she did not want to be with him, and said he needed to take Cylise and go back to Iowa. Christian took Cylise back to Iowa and did not see Paw again until October 21 at her mother's apartment in Lincoln.

On October 21, 2019, Christian and Cylise traveled to Lincoln after receiving messages from Paw's relative. Christian said he thought he and Paw "were basically going to have a mediation with the family talking about our relationship and possibly getting back together." When he arrived, he had a family friend wait with Cylise, who was sitting in Christian's car. Christian went inside the apartment. He

said that when Paw saw that he was there, "before any conversation started she just started saying something to her mother in their language and she got on the phone and walked away and she came to me and started pushing me and hitting me and telling me that I needed to leave"; Christian said he tried to restrain her so that she would stop hitting him and told her he was going to leave. Christian started to leave the apartment and saw "cop lights outside the apartment" and "two officers walking up to the apartment." After speaking with the officers, Christian was arrested and taken to jail. Christian's brother bailed him out of jail the next day, then they got Cylise from Paw's mother and went back to Iowa; a condition of Christian's bond was that he have no contact with Paw. As a result of the incident, Christian was charged with domestic assault of Paw, and he ultimately completed a pretrial diversion program in "late 2020."

Christian denied ever reaching a custody or parenting time agreement with Paw wherein the parties would alternate time with Cylise every 2 weeks. However, on November 8, 2019, Paw picked Cylise up for a 2-week "visit," and then Christian and his mother picked Cylise up in Lincoln at the end of those 2 weeks. Christian contacted an attorney in Iowa on December 6 to pursue custody of Cylise, and counsel advised Christian to not let Cylise leave Iowa. Counsel then filed a custody lawsuit in Iowa in mid-December. Paw's next in-person contact with Cylise was on January 14, 2020, when she came to Christian's parents' home with Iowa law enforcement and an ex parte custody order from Nebraska. Christian showed the officer the document his lawyer gave him, but the officer said the Nebraska order controlled, and Paw ended up taking Cylise back to Nebraska.

The stipulated temporary custody order was subsequently entered on May 8, 2020, after which Christian was allowed parenting time every other weekend and video chats. Christian stated that the video chats were generally "very unproductive" because Cylise was distracted, other children were in

the room and taking the phone trying to speak to Christian, and Paw "would cut off the phone early." During in-person parenting time, Cylise's behavior "was very poor" and he told Christian he did not have to listen. Additionally, Cylise was always "covered in little bed bug bites" and his complexion "was very dirty"—he had eczema that could be controlled with a daily application of cream. Christian took Cylise to the doctor multiple times to get him checked out and to get more cream.

Christian believed that it was in Cylise's best interests for the district court to award sole legal and physical custody to him, and he submitted a proposed parenting plan to the court. Christian believed he could effectively set aside any differences with Paw in order to coparent Cylise and stated that he had been trying to do so ever since the lawsuit was filed, but that she had not reciprocated. Christian stated that Cylise had a support system in Iowa and loved being around family.

Christian testified that August and her two children moved in with him around March 2020. He and August had a baby later in 2020 and were expecting another baby in the fall of 2021. Their home has four bedrooms, and Christian was in the process of putting in egress windows to get two additional bedrooms in the basement up to code.

### (ii) Paw's Testimony

Paw testified that she and Christian were living in Iowa when Cylise was born in 2016. Paw said that she was the one who primarily took care of Cylise. Paw started working after Cylise turned 1 year old, and she and Christian hired a family friend to care for Cylise when they both worked. At some point, Christian became unemployed. When Paw got home from work, Christian would go out with his friends "[m]ost of the times." Paw stated that she and Christian took Cylise to doctor appointments together because she did "not know how to speak English that much." In February or March 2019, August moved into the parties' home with

August's two children, and sometimes Paw took care of those children.

Although she could not remember the month, Paw testified that sometime in 2019, Christian accused her of cheating on him. Christian also told Paw, and she believed him, that because she was an immigrant, if they broke up and she fought for custody, she would not even have a "50/50" chance and would probably end up going back to the refugee camp.

Paw stated that on October 5, 2019, the parties were in Lincoln visiting her mother when Paw found out Christian had been cheating on her. Paw slapped Christian's face, he pushed her and yelled at her, and he locked her in the bathroom. Paw was "mad" and "really angry" and told Christian to take Cylise and go back to Iowa, but she stayed in Lincoln. Paw acknowledged that on October 5, she told Christian's stepmother that she wanted Christian to have custody of Cylise and that she did not even want to have "50/50" custody. Paw said the parties ended their relationship and she moved to Lincoln because Christian was "controlling, abusive, and cheating." Prior to moving, Paw did not report any abuse, nor did she tell other people about the abuse.

The next time that Paw saw Christian was at her mother's apartment in Lincoln on October 21, 2019. She said that the parties were inside and "[Christian] asked me to move . . . and I didn't move so he pushed me and we had a conflict," and Paw injured her right elbow. Paw's family members called the police, and Christian was arrested. Cylise, who was in Christian's car during the incident, stayed with Paw after Christian was arrested but was picked up by Christian's relatives the next day and taken back to Iowa. Later, after her coworkers asked her about her elbow injury, Paw posted a picture of the injury on a social media website on November 1 and said it was from cooking, even though that was not true.

After Paw moved to Lincoln, she and Christian reached an understanding that they would alternate parenting time every 2 weeks. However, when Paw went to pick Cylise up from

Christian in Iowa on December 27, 2019, they were not there. Paw filed her complaint on January 9, 2020, and asked for temporary custody. She was not aware of Christian's custody case in Iowa and was never served with his complaint.

Under the stipulated temporary order, Christian picks Cylise up from daycare every other week on Friday at 5 p.m. and drops him off at daycare on Monday at noon. During holidays or if there was bad weather, Paw gave Christian extra time. When Cylise returns from parenting time with Christian, Cylise sometimes acts like a "bully" to other children; the interpreter explained that the term in the Burmese language usually means he wants to be in charge over the children. Cylise has also had online communication with Christian since it was court-ordered in May 2020.

Paw testified that Cylise was "well and he is happy" since being in Nebraska. Paw's relatives, friends, and "supports" are in Nebraska. She believed that she provided a stable home for Cylise. They moved into a house in November 2019, and six other people currently live in the home with them. Cylise was enrolled to start kindergarten in Lincoln for the 2021-22 school year. Paw wanted the parenting time changed so that Cylise is returned on Sunday evenings once school starts. Paw did not think that Cylise should move to Iowa with Christian because Christian has a "temper issue," an "anger issue," and Paw does not want him "yelling at the kids." Paw believed that she and Christian are able to coparent and talk to one another. She also believed that it would be good if they could make decisions for Cylise together, but if they could not agree, she wanted the court to decide for them or she wanted to make the final decision.

### (iii) Other Witnesses' Testimony

Mayme Myint (Mayme), Paw's sister, testified that when Paw and Christian were in a relationship, he was "very control [sic] with [Paw]," he argued "every little thing," and he sometimes called Paw a "bitch." When asked if she ever

heard Paw talking poorly about Christian, Mayme responded, "No." Mayme stated that Paw did most of the parenting of Cylise when the parties were in a relationship. Mayme currently sees Paw and Cylise multiple times each week. Cylise has a clean place to live with space to play.

When asked if Christian ever threatened her family, Mayme responded, "Yes." She explained, "[Christian] said [Paw] would go to jail for two year [sic] and we have to pay his — his Iowa lawyer fee and both here and he said [Paw] slander [sic] his name and that it [sic] can go to jail for three months." And "he said [Paw] is not a citizen so it can be a different charge."

Leslie Gilbert (Leslie), Christian's stepmother, was asked which of the parties exercised a greater portion of the parental responsibilities for Cylise from the time of his birth through the end of September 2019. Leslie felt that Christian was more involved day to day in making sure Cylise was fed, bathed, clothed, and changed. She observed that there was affection between Christian and Cylise, that they played and did activities together, and that Christian was able to redirect Cylise's behaviors.

During Christian and Paw's relationship, Leslie observed arguments between them, but she never observed physical violence. On October 22, 2019, Paw contacted Leslie to let her know that Christian had been arrested after they got into an argument; Paw was willing to tell the police that it was both their faults, because she did not want Christian to go to jail. Leslie told Paw that she was "going to see what's going on," and "[i]f I can bail him out, that's what I'm going to do." Leslie's son was able to bail Christian out of jail, and Paw allowed Cylise to go back to Iowa. Leslie continued to have daily contact with Paw via text messages or video calls; the daily contact was still occurring at the commencement of trial. On December 27, 2019, Leslie texted Paw when she found out that Paw was not allowed to pick Cylise up in Iowa,

and Leslie offered to take Cylise to see Paw. Leslie cares about Paw and cares that they have a good relationship.

August testified that she has known Paw since they went to high school together in Thailand, and they reconnected via a social media website in the United States. August and two of her children temporarily lived with Paw, Christian, and Cylise in their Iowa home from March to August 2019. August did not observe any arguments or physical altercations between Paw and Christian while she was living with them. August stated that when she was living with them, Christian did more of the feeding, bathing, and grooming of Cylise than Paw. Paw and Christian took care of August's children when she worked, and August trusted Paw to take care of her children.

August testified that she and Christian started a relationship in July 2019, she moved out of Paw and Christian's home in August, and she stopped communicating with Christian in October. In October, Paw took to social media to accuse August of being the person Christian was "cheating on her with." In private online messages with Paw, contained in exhibit 34, August said that she was not the only woman he cheated on her with. August also said that she had been pregnant, "he" pushed her and she fell and could not breathe, she had blood all over herself, and she "took some medicine that I should take so I loss [sic] that child." During questioning, August stated that the "he" in exhibit 34 was Christian, but that she made the incident up because Paw had "destroyed my character on social media." During his testimony, Christian denied pushing August down and causing a miscarriage.

August stated that Paw sent her a private message saying that she did not want anything to do with Christian and that she wanted to "[s]tart . . . over" without Christian and Cylise. August resumed communicating with Christian in mid-January 2020, and she and her two children moved back into his home in February. She currently lived with Christian, their child (born later in 2020), and her two other children; Cylise also lives with them during Christian's parenting

time. August was currently pregnant with her and Christian's second child when the trial commenced. When asked if she had any hesitancy in leaving her children with Christian, August responded, "No."

(c) District Court's March 31, 2022, Decree

The district court found that Paw's testimony was credible, whereas Christian's and August's testimony was not credible. The court found that Cylise had primarily resided with Paw for 2 years and was thriving. Paw and Cylise had a strong bond and a good relationship. He was enrolled in school, was healthy, and had his daily needs met. The court stated that while Paw's living arrangement was not perfect, it provided greater stability for Cylise, and that she could meet his ongoing developmental needs.

The district court stated that Christian spent a considerable amount of time discussing his parenting after Cylise's birth but focused less on his current parenting. The court stated that Christian's testimony generally disputed Paw's testimony regarding the care of Cylise after his birth and during times when neither parent was working; the court found "the facts on each [party's] parenting are as testified to by [Paw]." The court noted that Christian disputed the allegations of abuse, but that he acknowledged past physical confrontations with Paw and an October 2019 incident of domestic assault, even though he blamed Paw for the incident.

The district court stated that the evidence at trial showed communication between the parties remained difficult, there was unresolved parental conflict, and "[t]he tumultuous relationship between the parties includes frequent arguments." The court found that "[m]ost concerning was [Paw's] testimony regarding the physical and emotional abuse she suffered from [Christian]," in particular the assault in October 2019, and that Christian "has repeatedly tried to convince her that she has no rights to her child because of her refugee status." The court found Paw's testimony about Christian's abuse to be

credible and a cause for concern. The court found that it was in Cylise's best interests that the parties "have less contact with each other, not more." The court found that Christian had committed domestic intimate partner abuse and that he did not meet his burden to prove that legal or physical custody, parenting time, visitation, or other access to Cylise would not endanger the child. The court found that Paw and Cylise may be adequately protected from harm by the limits the court imposed in the parenting plan.

The district court awarded Paw sole legal and physical custody of Cylise, subject to Christian's specified parenting time. Christian was to have regular parenting time every other weekend from Friday at 5 p.m. to Sunday at 8 p.m., and summer parenting time was to follow the regular parenting time schedule; a holiday parenting time schedule was also established. He was also awarded up to 10 minutes of daily telephone contact with Cylise when he was not exercising parenting time.

Christian argues that the district court's custody determination rested entirely on its finding of domestic intimate partner abuse and that it was Paw, not Christian, who committed domestic intimate partner abuse. Initially, we note that domestic intimate partner abuse was not the sole reason for the court's custody determination. The court also considered the parties' parenting history and current circumstances and found that Paw's home provided greater stability for Cylise.

[8] As to the domestic intimate partner abuse, there was conflicting evidence in the record. Christian testified to several instances of abuse by Paw through September 2019. Paw testified that she and Christian got into a physical altercation after she found out that that he was cheating on her. She also testified that Christian was abusive and controlling during their relationship, pushed her and caused her to injure her elbow, and told her that she had no rights to Cylise because she was an immigrant and that if she fought for custody, she would probably go back to a refugee camp. Mayme also

testified regarding Christian's threats that Paw would have to go to jail and have to pay his attorney fees. Christian denied all of this. However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Additionally, Christian was arrested and charged with domestic assault following the October 2019 incident with Paw, and he subsequently completed a pretrial diversion program. The physical incident, along with the threats (made to Paw and her family) regarding Paw's immigration or refugee status in the event of a custody dispute, satisfied the pattern of conduct necessary for a finding of domestic intimate partner abuse.

Based on our review of the record, we cannot say that the district court abused its discretion in awarding sole legal and physical custody of Cylise to Paw. Nor can we say that the court abused its discretion in awarding Christian parenting time every other weekend from Friday at 5 p.m. to Sunday at 8 p.m., daily telephone contact, and specified holiday parenting time. Although Christian argues that he should have been awarded parenting time for "a majority of the summer," as Paw agreed this was a possibility in her testimony, we cannot say the court abused its discretion by ordering that summer parenting time follow the regular parenting time schedule, particularly given Cylise's young age and the court's concerns related to the domestic intimate partner abuse. We also find no abuse of discretion in the court's decision to make Christian responsible for all transportation.

We note that Christian also claimed that the district court abused its discretion in refusing to receive exhibit 36, text messages alleged to be between Paw and Christian. The district court's basis for refusing this exhibit was that Christian did not identify it in his pretrial memorandum, something Christian said was a "typographical error." We find no abuse of discretion in the court's decision to refuse an exhibit that

the other party was not made aware of ahead of time. See *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015) (where Nebraska Evidence Rules commit evidentiary question at issue to discretion of trial court, appellate court reviews admissibility of evidence for abuse of discretion).

### 3. Child Support and
### Tax Exemption

#### (a) Child Support

Christian claims that the district court erred in both its retroactive and prospective child support determinations. He argues that by ordering retroactive child support, the court effectively rewrote the stipulated May 8, 2020, temporary order "in which Paw . . . implicitly agreed to no child support pending final judgment, and failed to account for the fact that Christian was responsible for all transportation in order to exercise his parenting time." Brief for appellant at 36. He further argues that he does not have the ability to meet both his prospective and retroactive child support obligations. Additionally, the prospective child support order does not account for the fact that Christian will be responsible for all transportation costs.

In its child support calculation, the district court attributed a monthly gross earned taxable income of $1,816.53 to Paw and of $3,853.20 to Christian, with each having "1.5 [e]xemptions." Neither party disputes the attributed incomes.

[9] The temporary order dated May 8, 2020, was agreed upon by the parties. It determined temporary custody and parenting time, as well as stated that Christian was responsible for all transportation. The temporary order was silent as to temporary child support. Christian acknowledges:

It is of course not unusual for a court to order a father of a child born out of wedlock to pay retroactive child support in a paternity action. *See*, e.g., *Henke v. Guerrero*, 13 Neb. App. 337 (2005). That is because children born

out of wedlock are entitled to the same support as chil-
dren born in wedlock. *Id.*

Brief for appellant at 37. However, he claims it is "unprece-
dented in a case such as this where the father had, irrespective
of a formal adjudication of paternity, already supported the
child prior to the commencement of the action." *Id.* (emphasis
omitted). While it is true that Christian supported Cylise prior
to the commencement of the action, there is no evidence of
support once Paw commenced the action in January 2020.
And contrary to Christian's assertion, there is no evidence
that Paw "implicitly stipulated to no temporary child support,
vis-a-vis the May 8, 2020" temporary order, or that no support
was ordered because he was responsible for all transporta-
tion. *Id.* at 37. We find that the district court did not abuse its
discretion in ordering retroactive support from February 2020.
*Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015)
(whether child support order should be retroactive is entrusted
to discretion of trial court, and decision will be affirmed
absent abuse of discretion).

Christian also argues that he cannot afford to pay both pro-
spective child support ($535 per month) and retroactive child
support ($300 per month), but the district court specifically
stated that it considered his ability to pay. We note that in
his testimony, Christian testified that he received a lump-sum
workers' compensation settlement at the end of 2019. He said it
was a $113,000 settlement, and he ultimately received $76,000
to $78,000 after attorney fees. We find no abuse of discretion
in the court's award of retroactive child support.

As to Christian's argument that the prospective child sup-
port order does not account for the fact that Christian will be
responsible for all transportation costs, we note that he did not
ask the district court for a deviation for such costs.

(b) Tax Exemption

[10,11] Christian claims that the district court erred in
awarding Paw the exclusive entitlement to the income tax

exemption for Cylise every year. Christian contends that the entitlement should have been allocated equally since he is required to provide all transportation and pay retroactive child support and attorney fees. The child dependency exemption is entrusted to the discretion of trial courts. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). A tax dependency exemption is an economic benefit nearly identical to an award of child support or alimony. *Id.* In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* But a court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires. *Id.* We find no abuse of discretion in the district court's decision to award the income tax exemption for Cylise to Paw.

### 4. Attorney Fees

Christian contends that the district court erred in requiring him to pay Paw's attorney fees and in requiring the attorney fees to be paid directly to Paw's attorney.

Christian argues that an award of attorney fees made in favor of a litigant belongs to the litigant and not to the attorney who performed the services. We note that in its order, the district court stated, "Judgment is entered against [Christian] and in favor of [Paw] in the amount of $30,000.00 for [her] attorney fees and costs incurred herein." It then set out the method of payment, wherein it said that Christian was to pay $500 per month to Paw's counsel through the district court clerk. Paw was awarded attorney fees and judgment was entered "in favor of [Paw]"; we find no error in this regard. We now turn to the award of attorney fees in general.

Paw requested that Christian pay her attorney fees and costs, and her attorney's affidavits were received into evidence. The affidavits stated that the attorney fees and expenses are "fair, necessary, and reasonable," and each stated that counsel was forced to perform additional legal work due to

Christian's continuous use of delay tactics. Although each affidavit states that it contains an itemization, each contains only an invoice. The invoice dated July 23, 2021, is for attorney fees totaling $36,672.50, plus expenses totaling $365.41. Another invoice, dated February 7, 2022, is for an additional $11,977.50 in attorney fees and $118.83 in expenses incurred since July 23, 2021. A third invoice, dated February 18, 2022, shows an additional $2,170 in attorney fees had been incurred; the affidavit noted in part that counsel "[had] been forced to perform additional legal services as a result of [Christian's] Application for Order to Show cause filed in bad faith and in a frivolous manner."

Christian testified about his attorney fees as well. He said that his previous attorney in Nebraska billed him approximately $24,000 and that his current attorney has billed him as well. His current attorney's affidavits were received into evidence and show that from November 18, 2020, to October 6, 2021, Christian was billed $25,051.44, which included $91.14 in expenses; an additional $1,200 in attorney fees was incurred from October 7, 2021, through February 8, 2022, for 4 hours of trial; $1,200 in attorney fees and $18.62 in expenses had been incurred December 24, "202[1]," through February 17, 2022; and counsel estimated an additional $300 in attorney fees would be incurred to "[a]ttend/conduct hearing on order to show cause" on February 18.

The filing of an affidavit or presentation of other evidence will always be the preferable way to support the award of attorney fees, but if the contents of the record show the allowed fee not to be unreasonable, then that fee would not be untenable or an abuse of discretion. See *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

In this case, the district court stated that the affidavits of Paw's counsel contained invoices, not itemization, and that although a detailed itemization may not be specifically required, it would have assisted the court in determining whether the larger fee that was requested was fair and

reasonable. The court said it considered the relevant factors and ordered Christian to pay $30,000 of Paw's attorney fees and costs.

Christian claims he cannot afford to pay attorney fees. But, as noted by Paw, Christian testified to receiving a large workers' compensation settlement. And while Christian claims that the fees were unreasonable, we note that both parties incurred significant attorney fees over the course of this case and that the attorney fees incurred by Paw were no more than those incurred by Christian. We find no abuse of discretion in the district court's award of attorney fees.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's amended decree dated April 21, 2022.

Affirmed.