IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE ON BEHALF OF WEST V. WEST

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF AIVALYNN WEST, A MINOR CHILD, APPELLEE,

V.

AUSTIN D. WEST, APPELLANT, AND KYNDRA M. SATTERTHWAITE,

INTERVENOR-APPELLEE.

Filed October 28, 2025.    No. A-24-648.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Nicholas R. Glasz, of Glasz Law, for appellant.

No appearance for appellee.

Eddy Rodell for intervenor-appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Austin D. West appeals from the Lancaster County District Court's order that awarded him and Kyndra M. Satterthwaite the joint legal custody of their daughter, with physical custody awarded to Kyndra. Because Austin did not include an assignments of error section in his brief as required by Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2022), we have reviewed the record only for plain error. Finding none, we affirm.

- 1 -

## II. BACKGROUND

### 1. PARTIES' BACKGROUND

Austin and Kyndra began a relationship in "2012 or 2013" and are the biological parents of Aivalynn West, who was born in August 2014. The parties have never been married.

Austin and Kyndra lived together in Lincoln, Nebraska, during Kyndra's pregnancy with Aivalynn. About a year after Aivalynn's birth, Austin and Kyndra "split up" for "about six months" but eventually reconciled and resided together until October 2017. At that time, Kyndra "moved out" after Austin was charged with felonies. According to Austin, in 2018, he was convicted of possession with intent to deliver marijuana and was sentenced to 4 to 5 years' imprisonment. Kyndra took Aivalynn to visit Austin "around six or seven" times during his incarceration. Austin served 2 years before being released on parole. After Austin's release from prison, Kyndra regularly allowed Aivalynn to see her father. Aivalynn visited Austin "[a]lmost" "every Christmas," "[m]ost holidays," and "[m]ost school breaks."

While Austin was incarcerated, the State initiated proceedings to establish paternity and obtain child support for Aivalynn. On March 18, 2019, the district court entered an order establishing Austin's paternity of Aivalynn and requiring him to pay support in the amount of $50 per month. Kyndra was designated as the payee. The order did not address issues related to custody or parenting time.

Following Austin's incarceration, Kyndra moved with Aivalynn to California to stay with her aunt for "a couple of months," briefly returned to Nebraska, and then traveled to Colorado to live with her sister in November 2018. After another brief stay in Nebraska, Kyndra and Aivalynn moved to Colorado in July 2019 and began to reside in large trailers with Kyndra's boyfriend, Franklin Satterthwaite, who she later married in June 2020 (he appears to have taken Kyndra's surname). While Kyndra and Franklin were building a house on undeveloped property in Colorado, Aivalynn attended first grade at a public school approximately 45 minutes from her home. During the 2021-22 school year, Aivalynn had a total of 26 absences.

Franklin has been convicted of several felonies, including burglary, theft by receiving a stolen vehicle, possession of a deadly weapon, and aiding and abetting. However, at the time of trial, Franklin's most recent felony conviction had occurred "about 13 [or] 14 years ago." In 2018, Franklin was charged with "domestic abuse or domestic assault" against the mother of his biological daughter, but the allegations were ultimately dismissed. Franklin has admitted to being a former affiliate of a gang.

In April 2022, Kyndra, Aivalynn, and Franklin moved to California because of "issues" with Kyndra's family members in Colorado. The main impetus behind the move was Kyndra's belief that Aivalynn's 7-year-old cousin was engaging in inappropriate sexual behavior towards Aivalynn. Kyndra specifically recounted one time where she saw the cousin's "private parts" "right in [Aivalynn's] face," and when Aivalynn would move away, the cousin shifted his hips toward Aivalynn. Both children were fully clothed during this incident. Kyndra expressed concerns to her family members and asked that Aivalynn be supervised around her cousins. Kyndra's parents told her the allegations were "bull crap" and disregarded her request.

After arriving in California, Kyndra, Franklin, and Aivalynn fell victim to a housing application scam, and the three temporarily moved in with Kyndra's aunt. During their stay,

Franklin and Kyndra slept on an air mattress on the living room floor, and Aivalynn slept next to them on either a "couch" or in a "tent" set up on the floor. Aivalynn finished the first grade in California.

### 2. KYNDRA'S COMPLAINT AND AUSTIN'S COUNTERCLAIM

In June 2022, Kyndra brought Aivalynn to Austin's residence in Nebraska for a 6-week visit. The night before Kyndra was to pick up Aivalynn, Austin informed Kyndra that he would not return their daughter due to concerns about Aivalynn's living conditions in Colorado and California. These concerns were brought to Austin's attention by Aivalynn and Kyndra's family members. On July 25, Kyndra filed a motion to intervene in the State's original paternity and support action against Austin. The district court entered an order granting Kyndra's motion, finding she was a "necessary party." On August 29, Kyndra filed a complaint with the court seeking "full custody, care and control of" Aivalynn and child support. Kyndra also sought a temporary order of custody, pending a trial on the merits.

On September 9, 2022, Austin filed an answer and counterclaim. In the answer portion of the filing, Austin denied Kyndra's contention that she was "a fit and proper person to be awarded the custody, care, and control of" Aivalynn and that it "would be in the best interests of" Aivalynn for Kyndra to have "full temporary and permanent" custody. Austin then counterclaimed, seeking an order "award[ing] him the temporary and permanent sole legal and physical custody of" Aivalynn and child support. On September 12, Kyndra denied Austin's assertions in his counterclaim.

The State took no position on the issues of custody and parenting time and is not involved in this appeal.

### 3. TEMPORARY CUSTODY ORDER

According to an order entered by the district court on November 4, 2022, the attorneys for the parties appeared before the court on October 21 regarding their "Motions for Temporary Orders"; "[e]vidence was adduced and arguments were made." The bill of exceptions on appeal reflects that "[t]here was no hearing on the record for the date of October 21, 2022." As such, our consideration of what evidence the court relied upon in awarding the parties joint legal custody of Aivalynn, with Austin receiving physical custody, is limited to the evidence later presented at trial. In the temporary order, the court indicated that Kyndra's residence was in California and that her parenting time was to "take place in Nebraska as mutually agreed upon by the parties." Kyndra was responsible for providing "reasonable notice and advance request of at least three (3) days to arrange visitation" with Aivalynn, and it was to take place at a "mutually agreed upon neutral location." The order stated that Austin "shall not unreasonably withhold parenting time from [Kyndra]." Austin's original child support obligation was terminated, and Kyndra was ordered to pay $180 per month in support. Nothing in the temporary order prohibited Franklin from seeing Aivalynn.

### 4. KYNDRA'S TRIPS TO NEBRASKA BEFORE TRIAL

While the district court's temporary custody order was in effect, Kyndra made a total of three trips to Nebraska to have in-person parenting time with Aivalynn. Kyndra drove "about 24

[or] 25 hours" from California for these visits and spent a "minimum" of $1,500 on each round trip.

Kyndra's first trip to Nebraska occurred in January 2023 and spanned 4 days. Kyndra was only able to spend "[a]bout three hours" with Aivalynn throughout the duration of her stay. Although Kyndra requested to have more parenting time with Aivalynn, Austin refused because he did not want "other people [on] the visit."

Kyndra's next trip to Nebraska was in July 2023 and spanned 4 days. Prior to travel, Kyndra engaged in a mediation session with Austin over the phone. The parties seemingly reached an agreement where Aivalynn would stay overnight with Kyndra in a hotel room when she arrived in Nebraska. However, Kyndra subsequently received a text message from Austin stating that "mediation was unsuccessful" "per his counsel[.]" The overnight stay did not happen. Austin also placed restrictions on Kyndra's parenting time. He informed Kyndra that Franklin was "not allowed to be [on] the visit." Kyndra saw Aivalynn twice during her second stay in Nebraska and only spent a total of "about three hours" with Aivalynn.

Kyndra's last trip to Nebraska for parenting time occurred a week prior to trial in March 2024. When Kyndra arrived at Austin's residence to pick up Aivalynn, Austin called the police because Kyndra's car registration tags were expired. According to Kyndra, when officers arrived, Austin's wife, Krystn West, accused her of "child neglect and child abuse," due to the expired tags. The officers allowed Kyndra to leave with Aivalynn, and Kyndra was not cited for any law violations. As a result of the authorities' involvement, Kyndra was only able to have "about an hour" of parenting time with Aivalynn. Despite the fact that more parenting time was scheduled the next day, Austin told Kyndra that "all visits" were "cancelled" "per counsel[.]"

### 5. TRIAL TO DETERMINE CUSTODY, SUPPORT, AND PARENTING TIME

A trial to determine custody, support, and parenting time was held on March 8 and April 24, 2024. The State waived its appearance. The district court heard testimony from several witnesses and received various exhibits as evidence. The evidence pertaining to Kyndra, Austin, and Aivalynn is summarized as follows.

### (a) Evidence Regarding Kyndra

At the time of trial, Kyndra lived in a home in California with Franklin, a 3-year-old son, and a 6-month-old daughter. Kyndra suffers from muscular dystrophy. She explained that if "muscles get over used or cold, they'll stiffen up and it causes a temporary paralysis until we gain warmth." She knows how to "prevent that from happening" so it only "happens slightly."

Kyndra graduated with a bachelor's degree in business from an "online school" in December 2023 and planned to obtain a master's degree in business administration. She worked "about 25 hours" a week doing credit card processing services, earning $18.50 an hour. Franklin was also employed and did "the forming for F-35 military jets." Franklin indicated that "[t]hey have cleared [him] . . . to work at [his] job."

Kyndra and Franklin owned real property in the mountains of Colorado and had begun construction on a home while living there. During the COVID-19 pandemic, the project became too expensive, and construction ceased after the price of lumber increased. Kyndra indicated at trial she and Franklin had a "business plan" to finish developing the Colorado property, "live off

the grid," and teach people "how to live sustainably." Aivalynn would attend a public school located approximately 45 minutes away from the property, if the family returned to Colorado. According to Kyndra, "Colorado is our home and that is where we will be returning," but she estimated that they would be in California "between two and three years."

Conflicting evidence was received by the district court regarding Kyndra's living conditions and parental fitness. Donna Satterthwaite, Kyndra's mother, testified that after Austin's incarceration, Kyndra was "very depressed" and "became addicted" to "[d]rugs and alcohol." During that time, Donna was Aivalynn's primary caregiver, and Kyndra would "leave in the evening" and not "return for 48 hours." Since 2019, Donna provided "monthly" financial support to Kyndra. Donna observed Kyndra's living conditions in Colorado and shared her concerns with the court. According to Donna, there was no "running water on the property," and Kyndra had to "haul" her own water. Donna saw "solar panels laying on the ground trampled by the horses" and questioned whether Kyndra had power. Donna also remembered seeing "mouse droppings" in Kyndra's home. Donna voiced worries about Franklin's aggression, recalling one instance where Franklin "mock[ed]" her for having muscular dystrophy and accused her of being a "drug addict[.]" Donna agreed it would be in Aivalynn's best interest to remain in Austin's custody. Jerry Satterthwaite, Kyndra's father, also believed it was in Aivalynn's best interests for Austin to be awarded sole legal and physical custody.

During her testimony, Kyndra contradicted most of the accusations against her. She stated the Colorado trailers were heated, powered by solar panels and a generator, had running water, and had a septic tank to dispose of waste. Kyndra did admit there were mice "at the very beginning" but stated the "issue was resolved right away" by getting cats and setting mouse traps. Kyndra and Franklin did have to "haul water" to put in a "cistern," but she stated this was "very normal" for the area.

Franklin also testified that government agencies came and inspected the Colorado property. The first inspection was a "wellness check" by "DHHS" which occurred at the "beginning of 2018" before Franklin's relationship with Kyndra. Franklin stated it "went well." Further, in 2019, Franklin attempted to get custody of his biological daughter who was in foster care in Nebraska. The State of Nebraska had "someone from Colorado" inspect the property as part of a "home study." When asked if he "pass[ed] the home study," Franklin responded, "One hundred percent[.]"

Kyndra also testified that while Aivalynn has been in Austin's temporary custody, she and Aivalynn talked on average "every other day." Kyndra agreed that Austin and his wife did help facilitate her relationship with Aivalynn "through phone calls."

(b) Evidence Regarding Austin

At the time of trial, Austin lived with Krystn in a four-bedroom home in Nebraska. Excluding Aivalynn, Austin cared for a total of four children. He and Krystn had two children (ages 2 and 3) and Krystn had two other children (ages 8 and 10). Austin worked as a full-time gutter installer for a construction company and earned $34 per hour. Krystn was employed by a law firm and worked as a paralegal.

Evidenced adduced at trial demonstrated Austin consistently provided for Aivalynn's needs while she was in his custody. Austin regularly ensured Aivalynn received medical care, had appropriate clothing, arrived to school on time, and was enrolled in extracurricular activities.

During his testimony, Austin took "accountability" for placing restrictions on Kyndra's in-person parenting time while the temporary custody order was in place. According to Austin, Aivalynn had expressed "multitudes of concern[s]" that worried him as a father. Specifically, Austin did not agree to Franklin being involved in Kyndra's parenting time. Austin stated that Aivalynn made representations to him that she was afraid Franklin would "kill her" if she returned to Kyndra's care. However, after reflecting on his actions, Austin indicated he wanted to help foster a relationship between Kyndra and Aivalynn. Austin stated he actively encouraged Aivalynn to make phone calls to her mother. Although Aivalynn would be "reluctant," Austin reminded her "how important it was to" "make an effort to have a relationship with" Kyndra.

Austin's sincerity was called into question on cross-examination. Austin admitted that he had no authority to contravene the district court's temporary custody order but stated his actions were in the best interests of his daughter. When asked whether it was fair that Kyndra was only allowed 1 hour of in-person parenting time the week before trial, Austin indicated it "probably [was] not fair and reasonable." Austin also conceded Kyndra was "justified" in being frustrated by her lack of in-person contact with Aivalynn. After Austin had previously testified that Kyndra's act of driving with an expired car registration did not put Aivalynn in danger, the following exchange took place:

[Kyndra's Counsel:] What kind of example do you think that sets for your daughter when you're standing outside the car telling [Kyndra] you're calling the police on her?

[Austin:] I don't know what kind of example that -- I don't know what you're trying to point at here.

[Kyndra's Counsel:] What kind of impression do you think that gives your daughter when she sees that?

[Austin:] That what her mother is doing is not okay and that's how I feel.

Following his testimony, the district court admonished Austin at the conclusion of the first day of trial:

THE COURT: I'm extremely troubled by the fact that you have not allowed your daughter to see her mother for the last two years. That you have been so restrictive. Sir you have an eight or nine year old child and when her mom comes to pick her up, you call the police. When you were testifying you acted like you did not understand why that would be frightening for your child and I'm going to ask you to think about that some more. Because the message you're sending to your daughter is so obviously negative toward her mom that frankly it's difficult for me to think you didn't do that intentionally. Of course your daughter's going to be scared when you call the police because her mom showed up to pick her up for parenting time. It sends the message to this little girl that her mom is bad. That the police have to come to protect her and protect you and protect your family. And if you don't see that sir then I'm going to encourage you to see a therapist. So that you can start to see things from your child's point of view and not just your own.

(c) Evidence Regarding Aivalynn

At the time of trial, Aivalynn was 9 years old and lived with Austin in Nebraska. According to Austin, Aivalynn was diagnosed with "Paramyotonia Congenitive Disorder" while in his custody. This condition causes Aivalynn to "struggle with physical activity." Aivalynn also has bifocals to help address her tendency to go "cross-eyed," "strain her eyes," and write letters backwards.

Aivalynn's second grade teacher during the 2022-23 school year provided testimony about Aivalynn. She described Aivalynn as a "top student," who did "did very well" and regularly attended school.

The teacher observed Aivalynn's behavior change after in-person and telephonic "visits" with Kyndra. She specifically noticed that Aivalynn would ask to go to "a calming area" in the classroom. Aivalynn told the teacher that she felt "anxious" and "sick to her stomach[.]" Aivalynn had shared concerns about Kyndra but did not elaborate on the nature of those concerns.

A licensed mental health practitioner also testified to Aivalynn's emotional state; she began working as Aivalynn's therapist in March 2023 and diagnosed her with "[a]djusment [d]isorder with [m]ixed [a]nxiety and [d]epression symptoms." On cross-examination, the therapist agreed that "part of" the reason for Aivalynn's adjustment disorder was the dramatic change of suddenly living with Austin in 2022.

During their therapy sessions, the therapist noticed Aivalynn "demonstrated quite a bit of anxiety" and "quite a bit of depression symptoms[.]" Aivalynn also reported that she "ha[d] trouble sleeping" and "ha[d] nightmares at times." The therapist noted Aivalynn's anxiety and depression "increase[d] when there's uncertainty" about "whether there will be some visits by" Kyndra. Aivalynn explained to the therapist that she becomes "very anxious in anticipation of" telephone calls with Kyndra. According to Aivalynn, there are "a lot of stressful moments" and "angry exchanges" over the phone that cause her "distress." Aivalynn also expressed that she is afraid of Franklin and does not like when he visits. When the therapist was asked if it would be in Aivalynn's best interests to be removed from Austin's custody, she responded Aivalynn would be "very upset" and "traumatized" if that were to occur.

Austin's wife Krystn also provided insights into the phone calls between Kyndra and Aivalynn. Krystn believed the calls were "sometimes very detrimental" to Aivalynn because Kyndra would discuss "the legal situation" and dismiss Aivalynn's fears relating to Franklin. Austin and Krystn did not monitor these phone calls on a "regular basis" but did listen when information about the court proceedings was mentioned. During rebuttal, Kyndra was adamant that she did not initiate conversations about court proceedings with Aivalynn. Rather, she maintained Aivalynn often brought up those conversations on her own.

After the first day of trial, the district court ordered parenting time between Aivalynn and Kyndra to take place while Kyndra was in Nebraska. Kyndra reported the "visit went very well," and Aivalynn "warm[ed] up" to Franklin. Kyndra did not observe any fear in Aivalynn.

(d) Proposed Parenting Plans

The district court received proposed parenting plans from both parties. Austin's plan called for "sole legal and physical custody" of Aivalynn, subject to Kyndra's parenting time. Under

Austin's proposal, "all visitation" was to occur in "Nebraska as mutually agreed upon by the parties." Kyndra's parenting time would "exclude" Franklin.

In contrast, Kyndra's plan provided for joint legal custody while Aivalynn's "primary residence" would be with Kyndra. However, the plan allowed parenting time with Austin "every summer," during "fall break and spring break," Thanksgiving "[e]very year," "Christmas [b]reak" on "[e]ven [n]umbered [y]ears," and "one weekend each month." It also provided for a "video chat" a minimum of once per week for no less than 30 minutes, along with "continuous and easy access to telephone contact with the other parent."

### 6. District Court's Order and Austin's Motion to Reconsider

On July 16, 2024, the district court entered an "Order for Custody, Parenting Time, and Support." The court determined that it was in Aivalynn's best interests for Austin and Kyndra to have joint legal custody, but Kyndra was awarded sole physical custody, subject to Austin's parenting time. The court adopted Kyndra's proposed parenting plan. The court also ordered Austin to pay $653 per month in child support. Further details of the court's order will be set forth in our analysis below.

On July 26, 2024, Austin filed a "Motion to Amend, Alter, Clarify, or Reconsider Order or Other Relief," which "specifically" requested "a ruling on the issue of removal from Nebraska" and Austin's child support obligation "consistent with the evidence adduced at trial." According to an order entered by the district court on August 23, a hearing on Austin's motion was held that day. The order indicated the attorneys for the parties appeared, the State waived its appearance, and "[a]rgument was heard." (There is no bill of exceptions contained in our record for this hearing.) The order overruled Austin's motion without explanation.

Austin appeals.

### III. ASSIGNMENTS OF ERROR

Our rules of appellate practice require an appellant's initial brief to include a section containing a "separate, concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error." § 2-109(D)(1)(e). Austin's brief does not contain a separate section assigning error. Rather, Austin's brief contains headings in a section labeled "Argument," which all assert the district court erred in various ways by awarding sole physical custody of Aivalynn to Kyndra. The argument headings contend that the court abused its discretion by (1) failing to properly consider the factors pertinent to determining the child's best interests; (2) concluding Austin would not reasonably facilitate the relationship between Kyndra and Aivalynn; (3) disregarding testimony about Aivalynn's "feelings and wishes, and by making unfounded conclusions about the testimonies given by Aivalynn's therapist and teacher," brief for appellant at 18; and (4) failing to conduct an analysis for removal of a child from the jurisdiction under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

However, the Nebraska Supreme Court has directed that headings will not be treated as an adequate substitute for properly placed and properly designated assignments of error. See *Swicord v. Police Stds. Adv. Council*, 309 Neb. 43, 958 N.W.2d 388 (2021). The failure to properly designate assignments of error impacts this court's standard of review, as set forth next.

## IV. STANDARD OF REVIEW

Ordinarily, child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024). However, when a party fails to comply with the commands of § 2-109(D)(1)(e), an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error. *Swicord v. Police Stds. Adv. Council, supra*. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id.*

The decision to conduct a plain error review is at the discretion of the appellate court. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). We choose to review the record for plain error.

## V. ANALYSIS

Several of Austin's arguments relate to his position that the district court did not properly consider Aivalynn's best interests in reaching its decision to award physical custody to Kyndra. He contends that the "only analysis the trial court provided in its Custody Order was with regard to [his] facilitation of a relationship between [Kyndra] and Aivalynn," and that this "one factor alone is not sufficient to determine what is in the child's best interests." Brief for appellant at 15. He suggests the evidence showed that he acknowledged he "could have made better decisions," but that he was able and willing to follow the court's orders. *Id*. at 18. Also, he argues that the court made "unfounded conclusions about the testimony" given by "two key witnesses," namely, Aivalynn's therapist and second grade teacher. *Id*. at 20.

Given our plain error review, we consider these arguments under the overarching umbrella of the child's best interests.

### 1. CONSIDERATION OF BEST INTERESTS FACTORS

When deciding custody issues, the court's paramount concern is the child's best interests. *Kee v. Gilbert*, 32 Neb. App. 1, 992 N.W.2d 486 (2023). Nebraska statutes provide that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). A trial court must consider the above statutory factors, at a minimum, when making determinations about the best interests of a child, in the context of custody. See *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect of the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See *Kee v. Gilbert, supra.*

The fact that one parent might interfere with the other's relationship with the child is also a factor to consider. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. *Jones v. Jones, supra*.

In its custody order, the district court referenced § 43-2923 and the "statutory best interests" factors. After providing a summary of the testimony and evidence in this case, the court stated it "considered the factors set forth above." When analyzing Aivalynn's best interests, the court noted Kyndra was Aivalynn's "primary caregiver" from birth and she had lived with Kyndra for the majority of her life until 2022, when Austin was awarded sole physical custody pursuant to the court's temporary order. It also pointed out that "[s]ome of the information provided by [Austin] in support of his request for Temporary Custody was refuted at trial." As an example, the court observed that Austin had represented that Aivalynn "lived in a home with no running water" and that this was "disproven at trial." The court concluded that Kyndra "consistently provided for" Aivalynn's "safety, emotional growth, health, and physical care." It found that "Aivalynn was well cared for when she was with [Kyndra]," and that Austin described her as a "'good mother.'" The court found both Kyndra and Franklin to be credible.

While the district court acknowledged Austin provided Aivalynn with "safety, health, and physical care," it took issue with Austin "[p]reventing Aivalynn from having a relationship" with Kyndra and Franklin during the pendency of the proceedings. It found that such action was "not providing for Aivalynn's emotional needs nor [was] it in [her] best interest." The court was not persuaded that Austin would facilitate a relationship between Aivalynn and Kyndra if he was awarded sole physical custody. It noted that Austin "violated" the court's temporary order and "unreasonably withheld Aivalynn from seeing her mother and/or stepparent." The court pointed to Kyndra's multiple efforts to exercise her parenting time under the temporary order, only to arrive in Nebraska and be denied access by Austin. The court was particularly troubled by Austin's conduct in July 2023, when he removed Aivalynn from Kyndra's car and called the police due to the vehicle's expired license plate. The court also pointed to Austin's proposed parenting plan, which required all parenting time to take place in Nebraska, prevented Franklin from being present, provided for no holiday parenting time, and was silent regarding telephone or video parenting time. The court determined that Austin's proposed parenting plan "illustrates that he does not plan to change his approach in facilitating any relationship between Aivalynn and her mother."

In contrast, the district court found that Kyndra had "shown by her conduct that she will encourage and facilitate a relationship between Aivalynn and [Austin]." It observed her efforts to take Aivalynn to see Austin when he was in prison, and while living in Colorado, Kyndra brought Aivalynn "back several times per year" and she "never put restrictions" on his time with their

- 10 -

daughter. Also, Kyndra's proposed parenting plan allowed for joint legal custody and for Aivalynn to be with her father every summer. It also provided for Aivalynn to stay with Austin throughout certain school breaks and holidays, as well as provided for video chats no less than once per week.

The district court considered the evidence from Aivalynn's second grade teacher and therapist and concluded that "any decline in Aivalynn's emotional health was likely due to the prolonged and ongoing lack of contact with her mother," who had been her "primary caregiver and relationship for the first eight years of her life." The court did not directly address the therapist's testimony that Aivalynn reported being afraid of Franklin and did not want to have visits with him. Nor did it address the therapist's opinion that removing Aivalynn from her current residence with Austin would "upset" Aivalynn and that she would be "[v]ery traumatized by that." However, when the therapist was asked if a "dramatic change like living with mom for eight years and then suddenly changing that to full-time with the other parent, can that cause anxiety and depression in your experience," the therapist responded that was "why we're at adjustment disorder . . . there's been . . . an adjustment time here and that's of course part of it." This evidence supports the court's view regarding the source of Aivalynn's emotional difficulties, which the record indicates developed after the change in temporary custody in November 2022. Further, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *Jones v. Colgrove*, 319 Neb. 461, 24 N.W.3d 1 (2025). It is not the role of an appellate court to question the credibility determinations of the district court. See *id.*

After our de novo review of the evidence, we cannot say the district court plainly erred in considering and weighing the factors pertaining to Aivalynn's best interests. Although the court did not make specific findings as to all factors required under § 43-2923(6), it stated it had "considered the factors set forth above," which included the "statutory best interests" factors. While a court is not necessarily obligated to provide a detailed analysis in custody decisions, it is best practice for a court to provide some detailed analysis in determining what is in the best interests of the children. See *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024). Here, the court engaged in a detailed analysis of Aivalynn's best interests and gave considerable weight to the fact Austin would "not appropriately encourage or facilitate a relationship between Aivalynn and her mother," as evidenced by his previous behavior and proposed parenting plan. This factor is relevant in child custody determinations. See *State on behalf of Kaaden S. v. Jeffery T., supra*.

We also observe that although considerable attention was given to Austin's behavior in withholding parenting time, it was not the only basis for the district court's conclusion. The court found that Aivalynn's "'model student'" behavior in second grade (while living with Austin) was nevertheless influenced by Kyndra in raising her, and that Aivalynn's emotional struggles and "adjustment disorder" were "more than likely due to her sudden, prolonged, ongoing lack of meaningful contact with her mother – her primary caregiver and relationship for the first eight years of her life." The sudden change occurred in November 2022 when the temporary order was entered, and the court specifically pointed out that some of the information provided by Austin in support of his request for temporary custody was "refuted at trial." Thus, while the evidence demonstrated that Austin properly cared for Aivalynn while in his temporary physical custody, the evidence also supported that temporarily changing Aivalynn's primary physical care from her mother to her father may not have been warranted. And as the trial court appeared to conclude,

Aivalynn's "adjustment disorder" may have stemmed from that sudden change and was not the result of any deficient or improper parenting by Kyndra.

Accordingly, we find no plain error in the district court's consideration of the necessary best interests factors and its decision to award Kyndra physical custody.

## 2. *FARNSWORTH* ANALYSIS

Austin's remaining arguments relate to the district court determining that a removal analysis under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), was not necessary. In its custody order, the court stated: "While a *Farnsworth* analysis is not necessary, for the sake of completeness and because it is discussed in [Austin] W[.]'s written closing argument, the court has also considered the general considerations set forth therein in making its findings."

In *Farnsworth*, the Nebraska Supreme Court held that a custodial parent seeking permission to relocate to another state with a minor child must satisfy a two-step test. "[T]he custodial parent must first satisfy the court that he or she had a legitimate reason for leaving the state." *Id.* at 249, 597 N.W.2d at 598. "After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her" and "whether a proposed move is in the best interests of the child is the paramount consideration." *Id.* at 249, 597 N.W.2d at 598. The *Farnsworth* court provided "three broad considerations" that ought to inform a court's decision as to whether removal is in a child's best interests: (1) "each parent's reasons for seeking or opposing the move," (2) "the potential that the move holds for enhancing the quality of life for the child and the custodial parent," and (3) "the impact such a move will have on contact between the child and the noncustodial parent (when viewed in light of reasonable visitation arrangements)." *Id.* at 249-50, 597 N.W.2d at 598. While not exhaustive, these considerations are designed to "serve as appropriate guideposts." *Id.* at 252, 597 N.W.2d at 599.

Subsequent appellate cases have clarified the application of *Farnsworth*. In *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004), the Nebraska Supreme Court concluded a *Farnsworth* burden analysis was not necessary in an initial determination of custody in a paternity case. In its reasoning, the court noted *Farnsworth* concerned issues of "parental relocation or the modification of a previous court-ordered custody agreement." *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. at 7, 679 N.W.2d at 755. However, the facts in *Pathammavong* did not involve the modification of a previous court-ordered custody agreement but, rather, an initial determination of permanent custody. Initial custody decisions "must be resolved on the basis of the fitness of the parents and the best interests of the child." *Id.* at 6, 679 N.W.2d at 755.

More recently, the Nebraska Supreme Court gleaned the following principles after an in-depth analysis of *Farnsworth*, *Pathammavong*, and their progeny: "In paternity cases, the *Farnsworth* burden applies to subsequent modification proceedings . . . but not to initial custody determination proceedings[.] Nonetheless, it is appropriate to apply *Farnsworth* general considerations in each of the foregoing proceedings." *Franklin M. v. Lauren C.*, 310 Neb. 927, 939, 969 N.W.2d 882, 890 (2022).

With the above principles in mind, we find that a true two-step *Farnsworth* analysis was not warranted in this case. The matter before us stems from a paternity action, and the district

court's operative order is the first permanent custody determination among the parties. The court contemplated, but did not provide, a detailed analysis of *Farnsworth*'s general considerations in its custody order. In light of the court's other discussion regarding the best interests factors, we find no plain error in the lack of separate findings under *Farnsworth*.

## VI. CONCLUSION

Finding no plain error in the record, we affirm the district court's July 16, 2024, "Order for Custody, Parenting Time, and Support."

AFFIRMED.