IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SOUMIT V. ESPINOZA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SAARA SOUMIT, APPELLEE,

V.

OCTAVIO ESPINOZA, APPELLANT.

Filed November 18, 2025.    No. A-25-178.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Octavio Espinoza, pro se.

Taylor L. Matthias, of McGill Law, P.C., L.L.O., for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Octavio Espinoza, pro se, appeals from the Lancaster County District Court's order that dissolved his marriage to Saara Soumit and awarded her legal and physical custody of their son. Because Octavio did not include an assignments of error section in his brief as required by Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2022), we have reviewed the record only for plain error. Finding none, we affirm.

## II. BACKGROUND

Octavio and Saara were married in July 2019. They had one son, Ismaeel Soumit-Espinoza, born in March 2022. According to Saara, the parties separated in October 2022.

### 1. PROCEDURAL BACKGROUND

Saara filed a complaint for dissolution of marriage in November 2023. However, numerous attempts to serve Octavio with a copy of the complaint were unsuccessful.

- 1 -

Saara filed an amended complaint for dissolution of marriage on March 6, 2024. She sought an equitable division of the parties' assets and debts, sole legal and physical custody of Ismaeel, and an allocation of the expenses for the child. She noted that Octavio had been ordered to pay child support in a separately docketed district court case. In his answer and counterclaim, Octavio, represented by counsel (at that time and through trial), sought joint legal and physical custody of Ismaeel and an award of attorney fees.

Both Octavio and Saara filed motions for temporary orders. Octavio sought joint legal and physical custody of Ismaeel. Saara sought sole legal and physical custody of Ismaeel, temporary spousal support, and attorney fees. On July 5, 2024, the district court entered a temporary order awarding Saara sole legal and physical custody of Ismaeel, with Octavio having parenting time every other weekend from Friday at 5 p.m. to Sunday at 7 p.m., and every Wednesday evening from 5 p.m. to 8 p.m. All work-related childcare and any "uncovered" medical expenses were to be paid 25 percent by Saara and 75 percent by Octavio. And Octavio was ordered to pay Saara spousal support in the amount of $1,000 per month and attorney fees in the amount of $2,500.

On October 15, 2024, Saara filed a verified motion for an order to appear and show cause, asking the district court to order Octavio to appear and show cause as to why he should not be held in contempt for failing to pay temporary spousal support. An order to appear and show cause was entered that same day.

## 2. TRIAL

Trial was held on October 24, 2024, and continued on January 21, 2025; the contempt matter was also heard on January 21. Saara and Octavio were the only witnesses to testify, and numerous exhibits were received into evidence. We set forth the evidence relevant to this appeal, namely "custody, child support, and alimony." Brief for appellant at 7. However, we note that child support was established through a separate district court case which is not before us in this appeal.

### (a) Child Custody

### (i) Saara's Testimony

Saara and Octavio were married on July 19, 2019, in Lincoln, Nebraska. She described her marriage to Octavio as "toxic," "[e]motionally abusive," and "[s]ometimes physically abusive." Octavio had "physically assaulted" her in March 2021; "[h]e grabbed my arm and pushed me out the door and slammed it in my face." Then in June of that year, he "hit me with my vehicle"; "he forgot to put it in park" and "[i]t hit my left thigh." Both incidents occurred while the parties lived in California, and Saara did not report either incident to law enforcement.

The parties lived in California prior to Saara becoming pregnant with their son. She stopped working in June 2021, "mainly because of the pandemic and then because [Octavio] said that he was making six figures at the time and that he could provide for me." However, Octavio provided "very little and inconsistent" financial support for her. The parties did not have joint financial accounts during their marriage.

Saara moved to Nebraska in January 2022, because she experienced pregnancy complications (antepartum depression, gestational diabetes, and reoccurring infections) and her "OB recommended to [her] that [she] needed to be . . . in an emotionally safe environment." Saara

had family (her parents and two younger brothers) in Nebraska and Octavio was supportive of the move. Saara lived with her family, and the parties' son was born in March. Octavio did not join Saara in Nebraska until April 1, "when [she] saw him at the hospital," and he stayed in Nebraska for "two weeks or so." Saara remained in Nebraska after the birth of their son, and the parties agreed that she would stay home with their child. Octavio returned to Nebraska at the end of April and "left again sometime in May." Saara was not "certain" as to when Octavio permanently moved to Nebraska. She said Octavio provided her "[v]ery little and inconsistent" financial support, and she "depleted" her savings to support herself and the parties' son; she did not return to work until 1 year postpartum.

When asked when she and Octavio separated, Saara responded, "October of 2022 is when he left my family's house." He obtained his own residence "11 minutes away," and "[v]ery frequently" traveled out of state; "[h]e was going either to California or he had a trip to -- he made a religious pilgrimage to Medina, Saudi Arabia." Octavio "[a]bandoned me and my son." Saara and Ismaeel continued to live with her family after the parties' separation. "A few months" later, Saara contacted child support enforcement, and the separate child support case was subsequently initiated.

Saara testified that she was "the only constant and consistent caregiver to [Ismaeel] since he was born." She had encouraged Octavio to be more involved with Ismaeel "[b]ecause he's the father and I wanted my son to have two active parents." It was expected that she would be the child's primary caregiver, and Octavio communicated his expectation to her. There were "[v]ery few instances" when Octavio cared for Ismaeel by himself, "and I've had to initiate those instances." Following the parties' separation, Octavio's parenting time "varied," "[s]ometimes it would be five hours at his place whenever I transport my son over," "sometimes it'll be three hours on the weekend," "sometimes we would go two weeks not seeing him but maybe 20 minutes a day that he would sprinkle in." The "[m]ajority of his parenting time is exercised [at my family's home] with my mother." Saara noticed that Octavio's parenting time increased in frequency "[a]fter he was served the child support papers." "After the child support he would come . . . maybe four times a week if not every day of the week but 20 minutes or so."

Saara moved out of her family's home in July 2023. Octavio moved back in with her family in October, "when [his] lease was up." From October to November, both Saara and Octavio were living in her family's home because Saara's apartment needed maintenance. She said that living with Octavio during that time was "stressful."

When asked what concerns she had about Octavio caring for Ismaeel, Saara replied, "That he has never been a primary consistent parent for Ismaeel." Octavio bathes Ismaeel but does not maintain his curly hair, "barely trims his nails," and does not make sure his teeth are brushed. Saara makes sure that Ismaeel's medical needs are met. Octavio has taken Ismaeel to "[o]nly a handful" of medical appointments.

When asked if Octavio ever failed to make sure that Ismaeel's medical needs were met, Saara responded that in October 2023, after she came home early from work, Ismaeel "walked past [her] and he flinched and touched his ear." Saara told Octavio that something was not right with Ismaeel's ear, but Octavio "brushed it off and said maybe it's just a small ear infection." The next day Saara "noticed that [Ismaeel's] ear was slightly enlarged," and after she reached out to her sister (a physician), she took Ismaeel to urgent care and then the emergency room; Ismaeel had

mastoiditis and required emergency surgery. "[A]round 3:00 in the morning" when Ismaeel was in the recovery room post-surgery, Saara asked Octavio "to take over so I can take a little nap or . . . just to rest a little bit," and she "heard [Octavio] denying medications to my son"; "[t]he nurse asked . . . if she could give [Ismaeel] Tylenol," but Octavio said "no he's just constipated." (Octavio denied that he refused to allow the nurse to give Ismaeel medicine. He said he "expressed concerns that they may be giving him to [sic] much" medicine.)

Saara testified that after a November 2023 hearing "[f]or child support," she sent Octavio a text message about "feeling exhausted" and "ask[ing] him to do more parenting, more overnights" with Ismaael. (According to Saara, Octavio had previously suggested to her that he wanted 50/50 custody only to reduce the amount of child support he owed. "If he wanted 50/50 joint custody, then he would have to help me 50 percent of the time which he wasn't doing.") She said that "[Octavio] threatened to take my son to -- to California." He "said that if I didn't want to be a mother that he -- his -- my son would be better off in California with his parents taking care of him." "He told me that he didn't believe that he was threatening me by saying he was going to take my son to California," "[h]e was saying that he was the legal father and that he . . . had every right to take him even if we were married and had an active . . . court case." When asked if she still had concerns about Octavio removing Ismaeel from Nebraska, Saara replied, "Yes," "[b]ecause he is often stating how he wants to take him to California"; she said he made such "threat[s]" "on five different occasions throughout the years."

When asked if Octavio had been following the temporary orders regarding his parenting time, Saara replied, "Not consistently." In June 2024, Octavio "refus[ed] to do overnights" with Ismaeel. In a text message exchange received into evidence, Octavio told Saara, "The order gives me the right to exercise visitation, it does not force me to exercise that right"; he also told her, "The court cannot force someone to take overnights, that's not the way it works."

Saara also testified that Ismaeel's current daycare did not cost her any money but had "[v]ery frequent" closures. (It would be closed for "several weeks" for the 2024 Thanksgiving and Christmas holiday.) When daycare was closed, sometimes family members could watch Ismaeel, but "whenever I would ask [Octavio], he sometimes would refuse to help me." Saara "had to take off work on several occasions" and "lost a full-time clinic position" because that company could not accommodate her attendance needs.

Saara did not want the parties' divorce to negatively impact Ismaeel, and she wanted him to see his father more consistently. According to Saara, Ismaeel was "tantruming a lot more," "throwing things, spitting," and "[e]xhibit[ing] more aggressive behaviors." She noticed an increase in Ismaeel's behaviors "[s]ince [Octavio] has been exercising more of his visitation time." Saara said that in her home "there's more structure" and routine and she did not give Ismaeel "free access to the phone or screen time." However, "on several occasions when I go to pick him up I see Ismaael holding [Octavio's] phone and it has caused behavioral issues when I go to pick him up."

Saara and Ismaeel currently resided at a confidential address registered with the State "[b]ecause I didn't feel safe with [Octavio] knowing where I lived." (On cross-examination she stated that she had a confidential address because she needed "a safe emotional space" for her and Ismaeel. Upon further questioning, she said that Octavio had "physically assaulted" her in March 2021, and "hit [her] with [her] vehicle" when the parties lived in California.) Saara was working

with a therapist to "address the traumas" caused by Octavio and "other traumas." Saara did not believe that Octavio was currently living in her family's house because "[m]y mother has stated such." Octavio did not let Saara know that he had moved prior to trial.

Saara sought sole legal and physical custody of Ismaeel, with the same parenting time schedule that was ordered in the temporary order, along with a holiday parenting time schedule.

*(ii) Octavio's Testimony*

Octavio testified that he went back to California "a couple weeks after my son was born" in 2022 to gather work materials, and then he came back to Nebraska in-mid April and has lived here full time ever since (he later testified that he officially moved in June). Although he had to travel back to California for work, he was approved to work remotely in "late 2023."

Octavio testified that Saara had "said and done multiple things to prevent" Ismaeel from meeting his extended family in California. She "refused" whenever Octavio asked to take Ismaeel to California. When asked about Saara's concerns that he would take Ismaeel to California, Octavio said that Saara's concerns were "based on a series of text messages we had due to the fact that she was not communicating appropriately when I was essentially taking care of him during my work hours"; if Saara did not pick Ismaeel up on time, then Octavio could not get any work done. "And so we had an argument via text where I said if she didn't want to be what she was attempting to be, which was is [sic] a single mother," "[t]hen I would just take him to California and have my family help raise him because culturally that's what we do," "we raise him together as a family." When asked if he told Saara numerous times that he would take their son to California, Octavio replied, "That was maybe one or two times." And when asked if he told Saara that it was well within his rights to take Ismaeel anywhere, Octavio responded, "[W]e had joint physical and legal custody so I felt like I was saying the truth essentially."

From April to October 2022, Octavio lived with his in-laws. In October, Octavio signed a 1-year lease on a town home. He thought it was important for the parties to have "[their] own space to really thrive." Although Saara spent 2 weeks at his home while her family "recovered from Covid," she never moved out of her family's home. Octavio "had access to [Ismaeel] . . . only at her place." Saara did take Ismaeel to Octavio's home "after she had arguments with her mom."

Octavio "had visits [with Ismaeel] almost every day within February -- I think late February all the way up to when [Saara] moved to her own place in November of `23." Octavio saw Ismaeel in December as well. In January 2024, Saara moved back to her family's house "for a few weeks" because her apartment needed repairs, and then "in February she left and took the baby." Octavio had moved back in with Saara's family after the lease was up on his town home, and "we were together in her family's house for about two months," "[m]onth and a half and then she moved out." Octavio lived with Saara's family "for a year." There were "many times" when Saara dropped Ismaeel off at her family's home and "I would be the primary caregiver during that time." Octavio moved into his own apartment in October 2024 "after I received essentially a threat that if I continued to stay with her mother she would request the Court to decrease my parenting time." (According to Saara, Octavio's testimony that she threatened his parenting time was "[a]bsolutely not" true.)

Octavio went to California to see his family the week of Thanksgiving 2024. He told Saara he was leaving "maybe like three days before." Octavio had parenting time on Wednesday

evenings, but said, "I have no physical or legal custody of my son so . . . if I can't make it to the visitation, then she has, you know, she has to take care of him."

Octavio attended a parent-teacher conference for Ismaeel in November 2024. His teacher brought up Ismaeel's aggressive behaviors, "and she mentioned that it could have something to do with not seeing me enough and also the transition between" the parties' homes and Ismaeel's grandmother's home, "so she speculates that it could be he doesn't deal with transitions well."

Octavio denied ever physically abusing Saara. He said they "would have arguments just like any normal couple." On cross-examination he acknowledged that he canceled their phone service "for like a day or two" after the parties had "a dispute" (no date given); "[s]he was ignoring me and she kept looking at her phone while I tried to have a conversation with her." When asked if he threw all of Saara's clothes out of the closet after another disagreement (no date given), Octavio replied that was "after she got -- thrown [sic] my possessions out the front door." And when asked if he often goes periods without talking to Saara when he is upset, Octavio replied, "This is when she had no regard for my feelings," and "if I don't feel appreciated, then I could close off."

Octavio sought joint legal and physical custody of Ismaeel, with a week-on-week-off parenting time schedule. Since this case started, the parties' ability to effectively communicate about Ismaeel was "[j]ust bare minimum of effectiveness." "Ideally" Octavio would like communication to improve. He said that Saara only wants to communicate through text, but he did not like texting because "[i]t doesn't convey the right tone sometimes and . . . sometimes she projects aggressive tone when there is none." Octavio would prefer verbal communication, either face-to-face or over the phone.

### (b) Spousal Support

Saara has a bachelor's degree in psychology and sociology and is a registered behavior therapist. She previously worked full time, but she lost that clinic position when they could not accommodate her needs when daycare was closed. Although she wanted full-time hours, she currently works part time, earning $28.75 per hour, but the number of hours she works each week varied, depending on when "clients are available." Her current monthly living expenses were approximately $4,000 per month.

Saara was requesting spousal support in the amount of $1,000 per month for 36 months because she was Ismaeel's primary caregiver, and she had a "loss of career growth" and "missed out" on "many job opportunities." Also, to advance in her field, she would need to "go back to school" for "[a]bout 2 years" to get her master's degree in behavioral analysis so she could become a board-certified behavioral analyst. According to the July 2024 temporary order, Octavio was ordered to pay Saara $1,000 per month in spousal support, but she never received any payments (full or partial) from him. Neither had she received any of the $2,500 in attorney fees he was ordered to pay her.

According to Octavio, Saara did not stop going to school because of their son. Octavio "gave her the option to not work and just stay at home and take care of our son which is something that's culturally relevant and also religiously relevant." "She knew that she had that option the whole time because I'm obligated as her husband within our religious framework to pay for her to do that."

Octavio worked full-time, earning $37.13 per hour; he confirmed that his "W-2 wages" were $74,768.43 in 2023 and $80,222.55 in 2022. He was able to work overtime in 2022 and 2023, but "was restricted" in his overtime "going forward in 2024." He did not pay "any monthly rent" while living with Saara's family because Saara's mother "wouldn't accept if I paid her rent," but "I would give her money anyway for groceries and for other things." As of September 2024, Octavio had over $13,000 in his bank account. According to him, he currently paid $1,300 to $1,400 per month in rent and utilities, $661 per month to lease his vehicle, $1,300 in child support (the child support order from the separate court case shows his monthly obligation is $695), had grocery costs and other costs of living, and he donated $400 per month. He also had to pay $500 per month in attorney fees. When asked if he could afford to pay $1,000 per month in spousal support, Octavio replied, "No."

### 3. DISTRICT COURT'S ORDERS

The district court entered an order of contempt and purge plan on January 21, 2025. The court found Octavio was in willful contempt of its July 2024 order for failing to pay his spousal support obligation and temporary attorney fees. Octavio was sentenced to 7 days in jail, but the execution of the order was suspended, and he was given an opportunity to purge himself of contempt by paying at least $500 per month towards his spousal support and attorney fees arrearages beginning February 1.

On February 6, 2025, the district court entered a decree that dissolved the parties' marriage, divided the parties' assets and debts, and ordered Octavio to make an equalization payment to Saara. The court awarded sole legal and physical custody of the parties' child to Saara, "subject to the terms and conditions of [Saara's] proposed parenting plan, exhibit 25, which the court adopts and finds is in the minor child's best interest." Pursuant to the parenting plan, Octavio was to have parenting time every other weekend from Friday at 5 p.m. to Sunday at 7 p.m., and every Wednesday evening from 5 p.m. to 8 p.m.; a holiday parenting time schedule was also established. The court noted that Octavio had been ordered to pay $695 per month in child support in a separately docketed case. All work-related or school-related childcare and any "non-covered" medical expenses (after the first $250 per calendar year) were to be paid 25 percent by Saara and 75 percent by Octavio. Octavio was also ordered to pay Saara spousal support in the amount of $1,000 per month for 24 months, and attorney fees in the amount of $5,000.

Octavio appeals.

### III. ASSIGNMENTS OF ERROR

Octavio's brief does not contain a separate assignments of error section. The rules of appellate practice require an appellant's initial brief to include a section containing a "separate, concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error." § 2-109(D)(1)(e). See, also, *Jacob v. Nebraska Bd. of Parole*, 313 Neb. 109, 982 N.W.2d 815 (2022) (pro se party held to same standards as one who is represented by counsel).

Octavio's brief does contain headings in the argument section which allege that (1) "The Trial Court Erred by Permitting a Tainted Proceeding," and (2) "The Trial Court Abused Its Discretion by Relying on Uncorroborated Claims." Brief for appellant at 5 and 6. However, the

Nebraska Supreme Court has consistently rejected headings in the argument section as a sufficient substitute for assignments of error contained in the proper place and properly designated. See *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023). When assignments of error are presented in the argument section of an appellate brief, rather than a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief (providing no review at all) or, alternatively, may examine the proceedings for plain error. *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023). In this appeal, we exercise our discretion to examine the district court's order for plain error.

## IV. STANDARD OF REVIEW

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id.*

## V. ANALYSIS

### 1. PLAIN ERROR REVIEW

Octavio "seeks reversal of the custody, child support, and alimony rulings." Brief for appellant at 7. We note that child support was established through a separate district court case that is not before us in this appeal, and we will therefore not address it here. Additionally, Octavio's brief contains no argument regarding alimony, and it will therefore not be considered on appeal. Accordingly, we review only the district court's custody ruling.

When deciding custody issues, the court's paramount concern is the child's best interests. *Kee v. Gilbert*, 32 Neb. App. 1, 992 N.W.2d 486 (2023). Nebraska statutes provide that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). A trial court must consider the above statutory factors, at a minimum, when making determinations about the best interests of a child, in the context of custody. See *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect of the child as a result of continuing or disrupting an existing relationship; the

attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See *Kee v. Gilbert, supra*.

The fact that one parent might interfere with the other's relationship with the child is also a factor to consider. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. *Jones v. Jones, supra*.

The district court found that Saara was Ismaeel's primary caregiver and had been since his birth. She had also been the parent primarily responsible for providing for the child's financial needs and medical care. It found that Octavio "has had very limited parenting time with the child despite [Saara's] encouragement that he spend more time with their son." It noted Saara's testimony that Octavio became more interested in spending time with the child after he was served with child support papers. And "much of [Octavio's] parenting time has taken place" at the home of Saara's family "with the maternal grandmother present." The court noted the text communications between the parties in June 2024 wherein Octavio told Saara that he had "'no obligation to do any overnights'" because the court gave temporary physical custody to her.

"Considering the relevant factors," the district court found that it was in Ismaeel's best interests to award physical custody to Saara, subject to Octavio's parenting time as set forth in Saara's proposed parenting plan, which the court adopted. The court also awarded Saara sole legal custody of Ismaeel, noting the parties had "little productive communication" and it was "unlikely the parties will set aside their personal differences when it comes to matters pertaining to the minor child."

Octavio's arguments regarding an alleged "[t]ainted [p]roceeding" are based upon the "exclusion of [his] affidavits." Brief for appellant at 5. However, the referenced affidavits were offered at the temporary hearing, not at trial. As noted by Saara, Octavio did not offer any affidavits into evidence at the trial, nor did he call any of the affiants to testify. Octavio could not be "strip[ped] . . . of critical evidence," *id*., that he never attempted to offer at trial.

Also, although Octavio argues that Saara's abuse allegations were not corroborated, the district court did not appear to rely upon the abuse allegations in its decree. Rather, the court specifically focused on the fact that Saara had been Ismaeel's primary caregiver since birth, and that Octavio had exercised limited parenting time with Ismaeel "despite [Saara's] encouragement that he spend more time with his son." The court also said that it "[c]onsidered the relevant factors," and found it was in Ismaeel's best interests to award sole legal and physical custody of Ismaeel to Saara, subject to Octavio's parenting time.

After our de novo review of the evidence, we find that the district court's decision to award sole legal and physical custody of Ismaeel to Saara did not constitute plain error.

## 2. SAARA'S REQUEST FOR ATTORNEY FEES

In her brief, Saara requests that this court order Octavio to "pay her attorney fees incurred in filing this responsive brief, as well as the costs associated with preparing and filing the Supplemental Transcript and Supplemental Bill of Exceptions necessitated by [his] failure to include critical portions of the trial records." Brief for appellee at 18. However, Saara's request does not comply with the appellate court rules for seeking such an award. See Neb. Ct. R. App. P. § 2-106(G) (rev. 2025).

## VI. CONCLUSION

Finding no plain error in the record, we affirm the district court's February 6, 2025, "Decree for Dissolution."

AFFIRMED.